IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No.

WILLIAM HUBER, as Parent and Guardian of ASHLEY HUBER and TAYLOR HUBER, individually and as surviving children of KELLY HUBER, deceased,

      Plaintiff,

v.

GRANBY REALTY HOLDINGS, LLC, d/b/a SKI GRANBY RANCH,

      Defendant.

---

## COMPLAINT AND JURY DEMAND

---

Plaintiff WILLIAM HUBER, as Parent and Guardian of ASHLEY HUBER AND TAYLOR HUBER, his minor children, in their individual capacity and as surviving children of KELLY HUBER, deceased, by and through his attorneys, James M. Leventhal, Bruce L. Braley, and Brian N. Aleinikoff of LEVENTHAL & PUGA, P.C., for his Complaint and Jury Demand against Defendant, GRANBY REALTY HOLDINGS, LLC, d/b/a SKI GRANBY RANCH, states as follows:

### PARTIES AND JURISDICTION

1.    Plaintiff William Huber is the father of Ashley Huber, a minor, and Taylor Huber, a minor.

2.    Plaintiff William Huber is the duly-appointed guardian for both Ashley Huber and Taylor Huber.  He was issued Letters of Guardianship for both Ashley Huber and Taylor Huber

by Bexar County Probate Court No. 2 in San Antonio, Texas on December 11, 2017. (See attached "Letters of Guardianship.")

3.      William Huber, Ashley Huber and Taylor Huber are citizens of and residents of the State of Texas.

4.      Kelly Huber was the mother of Ashley Huber and Taylor Huber.



5.      Kelly Huber and her daughters were skiing at Ski Granby Ranch on December 29, 2016.



6.      Kelly Huber was killed and Ashley Huber and Taylor Huber were severely injured when the ski lift they were riding on malfunctioned and ejected them to the hard-packed snow twenty-five feet below.

7.      Kelly Huber was a citizen of and resident of the State of Texas on the date of her death.

8.      Ashley Huber was born on March 3, 2004.  She was twelve years old when her mother died.

9.      Taylor Huber was born on May 14, 2007.  She was nine years old when her mother died.

10.     Under Colorado law, Plaintiff William Huber is entitled to recover for his minor children's pre-majority medical expenses and other pre-majority economic damages.

11.     Pursuant to Colorado law, Plaintiff William Huber has executed a relinquishment of his right to recover pre-majority economic damages by waiving and assigning his right of recovery in favor of his minor children, Ashley and Taylor Huber.

12.     Ashley Huber and Taylor Huber are the real parties in interest to pursue any claim for pre-majority medical expenses and other pre-majority economic damages.

13.     Granby Realty Holdings, LLC ("Granby Realty") is a Limited Liability Company that was organized under the laws of the State of Colorado and was formed on July 28, 2004.

14.     On information and belief, at all times material to this case, Defendant Granby Realty consisted of two members, SolVista Corp. ("SolVista") and Granby Investments LLC ("Granby Investments").

15.     SolVista is the successor to Sol Vista, Inc., a corporation organized under the laws of the State of Colorado and formed on September 26, 1995.

16.     SolVista, Inc. became SolVista Corp. on September 12, 2002.

17.     The principal office of SolVista is located in Golden, Colorado.

18.     Sol Vista was the previous owner and area operator of the ski area that became Ski Granby Ranch.

19.     SolVista operated the ski area that became Ski Granby Ranch from 1995 to 2005.

20.     From 1995 until March 2012, the ski area was operated under the name SolVista Ski Basin.

21.     SolVista is listed as the Registered Agent for Granby Realty with the Colorado Secretary of State.

22.     SolVista assigned the registered trademark "Family Fun – Colorado Style!" to Granby Realty on November 10, 2005.

23.     Granby Investments was initially organized on September 23, 2002, as a Limited Liability Company under the laws of the State of Colorado, with its principal place of business located in Granby, Colorado.

24.     Granby Investments subsequently filed for dissolution in the State of Colorado on January 22, 2004.

25.     Granby Investments, LLC re-emerged as a Limited Liability Company organized under the laws of the State of Delaware, with a formation date of April 3, 2006.

26.     On information and belief, on May 3, 2006, Granby Investments acquired a 35% interest in Granby Realty.

27.     Granby Realty commenced operations on March 21, 2005, as a developer with the stated purpose "to operate, maintain, improve, lease, sell and manage approximately 5,000 acres of property constituting the Ski Area, Golf Course, and the remaining undeveloped portions of the

Granby Ranch development, and to operate the Ski Area and Golf Course." (Limited Offering Memorandum for Granby Ranch Metropolitan District dated June 28, 2006.)

28.     SolVista contributed the Ski Area, the Golf Course, and the undeveloped property in the Development to Granby Realty in 2005.  (Limited Offering Memorandum for Granby Ranch Metropolitan District dated June 28, 2006.)

29.     On May 3, 2006, Granby Investments contributed $10 million ($2 million of which was required to be distributed to SolVista), plus a commitment to provide an additional $5 million of subordinate funding to Granby Realty within the next five years, in exchange for 35% ownership of Granby Realty.  (Limited Offering Memorandum for Granby Ranch Metropolitan District dated June 28, 2006.)

30.     The participation of Granby Investments in Granby Realty is evidenced by an Amended and Restated Operating Agreement of Granby Realty dated May 1, 2006.  (Limited Offering Memorandum for Granby Ranch Metropolitan District dated June 28, 2006.)

31.     Granby Realty owns and operates the ski resort in the community of Granby in Grand County, Colorado under the trade name of Ski Granby Ranch.

32.     Ski Granby Ranch was formed on December 18, 2012, under the laws of the State of Colorado.

33.     The principal place of business for both Granby Realty and Ski Granby Ranch is located in Grand County in the State of Colorado.

34.     In addition to operating under the trade name of Ski Granby Ranch, Granby Realty also operates under the following trade names:

      a.     Base Camp Lodge;

      b.     Golf Granby Ranch;

      c.     The Club at Granby Ranch;

      d.      Bike Granby Ranch;

      e.      Fish Granby Ranch;

      f.      Granby Ranch Homes;

      g.      Granby Ranch Cook House; and

      h.      Granby Ranch Dance Hall.

35.      Together, these business entities promote a family-friendly environment which provides year-round recreation opportunities in one central location in Grand County, Colorado.

36.      The U.S. District Court for the District of Colorado has jurisdiction over this matter pursuant to 28 U.S.C. § 1332(a)(1) as there is complete diversity of citizenship between the Plaintiff and the Defendant, including complete diversity between the Plaintiff and the two members of the Defendant, and the amount in controversy exceeds $75,000.

37.      The tortious conduct that gave rise to these claims occurred in the State of Colorado.

38.      Venue is proper in this Court under 28 U.S.C. § 1391.

## GENERAL ALLEGATIONS

### SKI GRANBY RANCH

39.      On information and belief, at all times material to this case, Defendant Granby Realty Holdings, LLC, was the owner and operator of Ski Granby Ranch, located near Granby, Colorado.

40.      Ski Granby Ranch is a Colorado Ski Resort that is open to the public for the purpose of skiing and snowboarding.

41.      The Defendant is, and at all material times was, the owner, area operator and licensee of the Quick Draw Express ski lift located at Ski Granby Ranch.



**QUICK DRAW EXPRESS SKI LIFT**

42.     The Quick Draw Express ski lift is, and at all material times was, a "public tramway" within the meaning of the Colorado Passenger Tramway Safety Act, and was subject to regulation by Colorado Public Tramway Safety Board.

43.     At all times material to this case, the owner and area operator of the Quick Draw Express ski lift at Ski Granby Ranch was the Defendant.

44.     The Quick Draw Express Lift is designated as "SC-008" by the Colorado Public Tramway Safety Board.  It is a detachable quad lift built in 1999 by Leitner Lifts.  The Quick Draw Express ski lift has a slope length of 4,360 feet and a vertical rise of 837 feet with 14 towers and a line gauge of seventeen feet five inches (17'5").

45.     The Quick Draw Express ski lift has been licensed to operate in the State of Colorado since December 9, 1999.

46.     Quick Draw Express was designed for a capacity of 2,400 passengers per hour at the design speed of 1,100 feet per minute in a clockwise rotation, but had a current tested capacity of 1,800 passengers per hour at all times material to this case.

47.     At all times material to this case, the Quick Draw Express included a top fixed drive chairlift using an Electric Prime Mover (electric drive that moved the chairs with skiers and snowboarders up the mountain).

48.     At all times material to this case, the Quick Draw Express had 67 four-passenger carriers or chairs.

## DUTIES OF SKI LIFT OPERATOR

49.     Under Colorado law, the primary responsibility for the design, construction, maintenance, operation and inspection of a ski lift rests with the area operator of the passenger tramway devices.  This amounted to a nondelegable duty on the part of the Defendant.

50.     Under Colorado law, the standard of care applicable to a ski lift operator for the design, construction, maintenance, operation and inspection of a ski lift is the highest degree of care commensurate with the practical operation of the ski lift.  As the owner and area operator of the Quick Draw Express, the Defendant owed the highest duty of care to Kelly Huber, Ashley Huber and Taylor Huber while they were passengers on the Quick Draw Express on December 29, 2016.

51.     The Defendant was in a special relationship with Kelly Huber, Ashley Huber and Taylor Huber by virtue of undertaking the risk to provide them with safe passage on the Quick Draw Express on December 29, 2016.  This special relationship gave rise to a nondelegable duty to exercise the highest degree of care in providing them safe passage to the top of the Quick Draw Express chair lift.

52.     Under the circumstances of this case, the Defendant had exclusive possession and control of the Quick Draw Express ski lift, which was used in the conduct of its business.

53.     At all times material to this case, the Quick Draw Express ski lift was operated at considerable height above the ground over rough, elevated, precipitous snow-packed terrain.



54.     At all times material to this case, the Defendant knew or should have known that a fall from the Quick Draw Express could be calamitous to the occupant of the ski lift, resulting in serious permanent injury or death.

55.     At all times material to this case, the Defendant knew or should have known that passengers on the Quick Draw Express, including Kelly Huber, Ashley Huber and Taylor Huber, entrusted their safety to the operator of the Quick Draw Express ski lift.

56.     At all times material to this case, the Defendant knew or should have known that the operation of a ski lift like the Quick Draw Express entailed both greater danger and greater responsibility than circumstances involving ordinary care.

57.     At all times material to this case, the Defendant exercised significant control over the safety and well-being of Kelly Huber, Ashley Huber and Taylor Huber while they were passengers on the Quick Draw Express ski lift at Ski Granby Ranch.

58.     As passengers on the Quick Draw Express, Kelly Huber, Ashley Huber and Taylor Huber were relatively powerless to secure their own safety under the circumstances.

59.     A state of dependence and trust existed at all times material to this case between Kelly Huber, Ashley Huber and Taylor Huber and the Defendant, as owner and operator of the Quick Draw Express ski lift.

60.     At all times material to this case, Kelly Huber, Ashley Huber and Taylor Huber had surrendered themselves to the care and custody of the Defendant while riding on the Quick Draw Express – they had given up their freedom of movement and actions and there was nothing they could do to cause or prevent the tragedy.

61.     The event that killed Kelly Huber and severely injured Ashley Huber and Taylor Huber is of the kind that ordinarily does not occur in the absence of negligence.

62.     Responsible causes other than the Defendant's negligence will be sufficiently eliminated by the evidence produced at trial.

63.     The presumed negligence is within the scope of the Defendant's duty to Kelly Huber, Ashley Huber and Taylor Huber.

64.     Under the doctrine of *res ipsa loquitur*, Plaintiff is entitled to a rebuttable presumption that the Defendant was negligent.

## 2016 MODIFICATIONS TO QUICK DRAW EXPRESS

65.     On information and belief, sometime in early 2016, the Defendant contacted an individual named Ed Thompson, who worked for a company called Electramic Associates – Ski

Resort Specialties, to discuss replacing the control system and electric drive on the Quick Draw Express.

66.     On information and belief, Ed Thompson contacted an engineer named Josef Gmuender to provide engineering services for the Quick Draw Express project.

67.     On information and belief, issues subsequently arose concerning the Defendant's financial ability to replace the control system and electric drive on the Quick Draw Express.

68.     On information and belief, Ed Thompson informed the Defendant sometime in mid-2016 that there was insufficient time to complete the planned system upgrade project.  At that time, the Defendant decided to change only the electric drive portion of the planned control system upgrade.

69.     On information and belief, Electramic Associates performed work to replace the electric drive on the Quick Draw Express at Ski Granby Ranch between November 28, 2016, and December 4, 2016.  Specifically, that work consisted of:

     a.    Replacing the original 1999 digital DC electric drive with an ABB DCS-800 digital DC electric drive;

     b.    Adding an interface controller between existing low voltage controls and the new electric drive with the intention of adding "safety functions" for both electric and auxiliary operations of the Quick Draw Express;

     c.    Fine-tuning to set parameters in the new electric drive that controlled how the drive interacted with the electric motor that drives the Quick Draw Express; and

     d.    Routine maintenance of the electric motor off-site.

70.     On information and belief, Josef Gmuender arrived on site on December 1, 2016, to assist with the interface of wiring between the new electric drive and the existing controls.

11

71.     Following the completion of this work, the Quick Draw Express upgrade was tested for acceptance and approved by representatives of the State of Colorado on or about December 5, 2016.  At the same time, an annual licensing inspection was conducted on the Quick Draw Express on December 5 and 6, 2016.

72.     The State of Colorado issued a license to operate the Quick Draw Express ski lift to the Defendant on December 15, 2016, and the ski lift was opened to the public that same day.

**UNSAFE CONDITIONS ON QUICK DRAW EXPRESS BEFORE 12/29/16**

73.     On information and belief, after the Quick Draw Express license was issued and after the upgraded ski lift started to operate, passengers on the Quick Draw Express experienced unsafe riding conditions and reported these conditions to representatives of the Defendant. Specifically, two engineers (Marco and Jennifer Aieta) who owned a home at Granby Ranch were skiing at Ski Granby Ranch a week before December 29, 2016, and raised concerns with representatives of the Defendant about problems with the Quick Draw Express chair lift.  More specifically, they described an "intense, high amplitude swinging and bounce [that] was way out of the ordinary and appeared to be a change in operational procedure to speed skier transport." This swinging and related vertical bounce were so significant that it was necessary to "hold onto something" to stay on the chair.

74.     Another individual, Soonie Suh, had taken her children skiing at Ski Granby Ranch the Monday (December 23rd) and Tuesday (December 24th) before Kelly Huber's fall and death. Suh noticed that the Quick Draw Express lift "stopped and swayed often" and the swaying "would sometimes take her breath away."  Suh experienced the Quick Draw Express speeding up and slowing down, causing many guests to have difficulty exiting the lift at the top.  On one of her trips up the Quick Draw Express, Suh and her son sat next to a Ski Granby Ranch employee

wearing a "Managing Director" name tag.  When her son shared his concerns with this employee about the stopping and swaying on the Quick Draw Express lift, the employee assured them the lift was fine.

75.     Despite this knowledge of unsafe conditions, the Defendant did nothing to immediately shut down the Quick Draw Express, determine what was wrong with the Quick Draw Express, and eliminate the factors that contributed to these unsafe conditions.

76.     The Defendant's knowledge of hazardous conditions on the Quick Draw Express before December 29, 2016, its awareness of the danger to its guests if it failed to do anything about those hazardous conditions, and its failure to respond to the concerns of its guests about the safety of the Quick Draw Express before December 29, 2016, constitutes gross negligence.

**WHAT HAPPENED ON DECEMBER 29, 2016**

77.     On the morning of December 29, 2016, at 9:07 a.m., Ski Granby Ranch employee and Upper Lift Operator Sarah Merritt noticed that the Quick Draw Express lift "stopped unusually fast."  When she looked at the computer monitor for the Quick Draw Express, she saw no information about the stop.  Merritt could not restart the lift, so she called for a mechanic.  Ski Granby Ranch employees Blake Langolf and Andy Birch (mechanic) arrived to assess the Quick Draw Express lift.  Andy Birch discovered an F-71 fault on the monitor for the electric drive and restarted the Quick Draw Express chairlift.

78.     On the morning of December 29, 2016, Kelly Huber and her daughters boarded Chair Number 58 on the Quick Draw Express Chair Lift at Ski Granby Ranch.  Kelly was seated in the middle of the chair and her daughters were on either side of her.



Ashley Huber, taken 12/29/16 at 9:36 a.m. at base of Quick Draw Express

79.     When the Hubers boarded Chair No. 58, the weather was partly cloudy, temperatures were around 30 degrees F., and wind speeds were less than five miles per hour.

**EYEWITNESSES TO TRAGEDY AT SKI GRANBY RANCH**

80.     At all times material to this case, Jordan Schwartz was employed by Ski Granby Ranch Ski Patrol.  As the Huber family boarded Chair No. 58, Schwartz was riding immediately

in front of them in Chair No. 57. As he ascended ahead of the Huber family, Schwartz noticed a quick stop and start, and then his chair experienced a big vertical sway and bouncing. Schwartz noticed an increase in vertical movement, heard a "thunk," and felt a rattle/vibration through the wire rope line that carried the chairs. He turned around and saw three people falling from Chair No. 58 as it swung horizontally. Schwartz saw Kelly Huber holding Ashley Huber in an attempt to protect her young daughter from the impact with the ground. Schwartz could only see one of the children moving after the fall. Schwartz immediately radioed Dispatch at Ski Granby Ranch to notify them of the fall and then proceeded to lower the bar on Chair No. 57. Schwartz observed other members of the Ski Patrol arrive at the scene of the fall and saw several bystanders stop and render aid to the Huber family.

81.     Zach Pappas was riding in Chair No. 59. He described Chair No. 59 as swaying back and forth so violently that "we almost came off the track." Pappas said Chair No. 59 "came within inches" of striking the tower. Pappas said the pulse that impacted his chair transferred to Chair No. 58, which was "swaying incredibly hard" and hit the tower. Pappas saw Kelly, Ashley and Taylor Huber "hit directly on their heads" when they hit the ground. Significantly, Zach Pappas told authorities that he had been skiing at Ski Granby Ranch the past few weeks and "had experienced very aggressive stopping of the lift and swinging back and forward while riding that lift [Quick Draw Express]."

82.     Rory Jones was riding in Chair No. 59 immediately behind the Huber family. Jones' chair began to sway violently and swung at least 30 degrees and nearly hit a tower before the Huber family was ejected from Chair No. 58. Jones' chair stopped after the tower. Five to ten seconds later, Chair No. 58 began shaking violently, hit the tower, and the Huber family fell to the ground. Jones saw Ashley Huber land on top of Kelly Huber. He saw Taylor Huber land on her

left side.  Only Ashley Huber moved after all three fell.  Jones and the other occupants of his chair yelled at Ashley to stay down and yelled at everyone to find help for the Hubers and stop the Quick Draw Express lift.

83.     Thomas Jones was riding in Chair No. 59 immediately behind the Huber family. His chair also nearly hit a tower.  Thomas Jones saw Chair No. 58 hit Tower 5, then saw the Hubers ejected from the chair and fall to the ground.  Thomas Jones heard one of the Huber daughters yelling, "Don't let her die!" At approximately 9:44 a.m., Thomas Jones captured video footage and a photograph of the aftermath depicting the conditions immediately after the Huber family fell from Chair No. 58.



84.     Glenn Samola was riding in Chair No. 59 immediately behind the Huber family. Like Rory Jones, he experienced their chair starting to swing drastically, at least 45 degrees. He saw the Hubers' chair hit Tower 5 and the Huber family fall to the ground. Samola also noted that the lift operator kept starting and stopping the lift.

85.     Katharine Aarnio and Brent Aarnio were riding in Chair No. 60 behind the Huber family. As their chair started up the Quick Draw Express, "we started to bounce that turned into heavy swaying back and forth." Katharine Aarnio had never felt such swaying on a chairlift. She described their chair as almost hitting a tower before the Hubers hit Tower 5. She saw the Hubers hit Tower 5, get ejected from Chair No. 58, and fall to the ground. Brent Aarnio said their chair was swaying so severely that their gear made contact with the Tower, but not their chair. The Aarnios heard screaming after the Hubers fell and they started to scream for help for the Hubers.

86.     According to Ski Granby Ranch employee and Upper Lift Operator Sarah Merritt, the incident where Chair No. 58 struck Tower 5 caused a fault that abruptly stopped Quick Draw Express lift.

**TRAGEDY AT 9:42 A.M.**

87.     The Black Box recording for the Quick Draw Express shows the Tower 5 fault occurring at 9:30 a.m. On information and belief, this recording is off by approximately 12 minutes, indicating that Chair No. 58 struck Tower 5 at approximately 9:42 a.m.



88.     Other witnesses noted that the Quick Draw Express chair lift had started and stopped before the chairs started violently swinging side-to-side at a dramatic angle.

**ADDITIONAL EYEWITNESSES**

89.     John Huseby was snowboarding at Ski Granby Ranch when he heard the Hubers fall from the Quick Draw Express.  Huseby immediately unclipped his board and ran to where the Huber family lay.   Huseby was first to arrive at the scene.   He noted that Kelly Huber was unresponsive, but had a pulse.  When additional help arrived, Huseby helped turn over Kelly Huber to begin CPR.  Huseby then tried to comfort and calm down Ashley Huber, who was saying: "My back hurts.  My leg hurts.  Is my Mom okay?  Is my sister okay?  Am I alive?"

90.     Jason Zerrer was on the ground at Ski Granby Ranch when he heard a metal mechanical sound from the Quick Draw Express, looked over, and saw the Hubers falling the last

10-15 feet after their ejection from Chair No. 58.  Jason Zerrer immediately responded to the scene and noted that Kelly Huber was unresponsive and Taylor and Ashley Huber were complaining of back and leg pain.

91.     Lana Zerrer was on the ground at Ski Granby Ranch when she heard screaming and saw the Huber family on the ground below the Quick Draw Express chair lift.  She ran over and saw that Kelly Huber was unresponsive. Lana Zerrer noted that Taylor and Ashley Huber were both conscious and complaining of pain in their backs and legs when she saw them.  She also observed that Taylor Huber's ski helmet was cracked in multiple places.

92.     Dr. Taka Zahra was on the ground at Ski Granby Ranch when she saw the Hubers in midair before hitting the ground.  Dr. Zahra immediately responded to the scene and began CPR on Kelly Huber until first responders arrived to take over her care.  Dr. Zahra also assessed the injuries sustained by Taylor and Ashley Huber.

93.     The force of impact from a twenty-five foot fall was so powerful that it cracked the helmet worn by Taylor Huber.

 

**THE AFTERMATH – EMERGENCY MEDICAL CARE – KELLY HUBER**

94.     Kelly Huber was severely injured in the twenty-five foot fall from Chair No. 58 to the hard snow-packed ground below Tower 5.

95.     Kelly Huber's right leg was shortened and externally rotated after she hit the ground.  Kelly's right forearm was deformed.

96.     Kelly Huber went into traumatic cardiac arrest after she hit the ground.

97.     Bystanders and members of the Ski Patrol at Ski Granby Ranch began CPR at approximately 9:48 a.m. and attempted to establish an airway.

98.     Grand County Emergency Medical Services was notified of Kelly Huber's injuries at 9:49 a.m. on December 29, 2016, and was en route to Ski Granby Ranch twenty seconds later.

99.     A team of paramedics arrived on scene at Ski Granby Ranch at 9:56 a.m.

100.     The Ski Patrol brought Kelly Huber down to the back of the ambulance on a sled. She was secured to a backboard with head blocks in place.

101.     A member of the Ski Patrol was performing chest compressions on Kelly Huber when she arrived at the ambulance.

102.     Paramedics from Grand County Emergency Medical Services took over care for Kelly Huber at 10:00 a.m.

103.     Kelly Huber was unresponsive and had no pulse at 10:00 a.m.  Her skin was pale and cyanotic.  Her pupils were fixed, non-reactive and dilated.  She had no carotid pulse.

104.     Paramedics and members of the ski patrol continued to perform CPR at the scene. Kelly Huber was ventilated with a Bag Valve Mask and placed on a cardiac monitor.  Her initial cardiac rhythm was asystole, which is the most serious form of cardiac arrest and usually

irreversible.  It involves a state of total cessation of cardiac activity from the heart, resulting in a loss of tissue contraction from the heart muscle and no blood flow to the rest of the body.

105.    At 10:29 a.m., the ambulance left the scene at Ski Granby Ranch and transported Kelly Huber to the Emergency Department at Middle Park Medical Center in Granby.

106.    The ambulance arrived at the hospital at 10:35 a.m.

107.    Kelly Huber was rushed to the Emergency Department at Middle Park Medical Center, but was pronounced dead at 10:46 a.m. An autopsy performed by Dr. Michael Burson ruled that the cause of death was a torn aorta caused by blunt trauma to the upper torso resulting from her fall from Chair No 58.

**EMERGENCY MEDICAL CARE – TAYLOR HUBER**

108.    First responders from Grand County EMS were attending to Taylor Huber at the base of Tower 5 by 10:12 a.m.



109.    The Trauma Team at Middle Park Medical center was activated at 10:20 a.m. to prepare for Taylor Huber's arrival.  The EMS radio report from the scene described Taylor as having a "right pupil dilated."  She was also described as having shortness of breath and right upper quadrant pain.

110.    Taylor Huber left Ski Granby Ranch by ambulance at 10:22 a.m. and arrived at Middle Park Medical Center Emergency Department in Granby at 10:32 a.m.  She was immobilized on a back board and in a right leg splint for transport.

111.    When Taylor Huber arrived at the Emergency Department at 10:32 a.m., she was crying and complaining of severe pain in her right leg.  Her injury was described as a "25 foot fall from ski lift."

112.    Taylor Huber's chief complaints on admission to the Emergency Department were listed as "Right leg pain – Altered Mental Status."

113.    Taylor Huber's initial assessment was performed in the Emergency Department at 10:35 a.m.  During that assessment, she was noted to have:  shallow breathing and pain inhaling; inability to recall the event that caused her injuries; an abrasion on her mid forehead; midline neck pain, which resulted in the placement of a cervical collar throughout her stay; midsternal pain in her chest; and a displaced fracture of her right mid tibia and fibula; right leg pain; back pain and chest pain.

114.    Taylor Huber was given pain medication and placed on supplemental oxygen.

115.    Taylor Huber was taken for CT scans at 11:20 a.m.  She returned to the Emergency Department at 12:00 p.m.

116.    As a result of imaging studies at Middle Park Medical Center, Taylor Huber was diagnosed with fractured left and right first ribs, a lung contusion or laceration, a pneumothorax,

a Grade 1 kidney laceration, a Grade III laceration of her spleen, and displaced fractures of her tibia and fibula.



117.     Taylor Huber was unconscious for a period of time after her fall.  She had a concussion and has no memory of these events from about two hours before she fell until after she was transported to Children's Hospital in Denver.  During her time at the Emergency Department in Granby, Taylor Huber had no recall of the events that led to her hospitalization, including the tragic fall from Chair No. 58 at Ski Granby Ranch with her mother and sister.

**LIFE FLIGHT TO CHILDREN'S HOSPITAL – COLORADO – TAYLOR HUBER**

118.     Taylor Huber was discharged from Middle Park Medical Center at 12:17 a.m. and transported by Life Flight to Children's Hospital of Colorado in Aurora for a higher level of care given her significant injuries.

119.     Taylor Huber was a patient at Children's Hospital until January 4, 2017.

120.    During her hospitalization at Children's Hospital in Aurora, Taylor Huber had surgery consisting of a closed reduction of her right leg fractures with a long leg cast on December 21, 2016.

121.    Additional injuries diagnosed and treated at Children's Hospital Colorado included a right wrist fracture (distal radius) and thoracic compression fractures at T5-T8.

## MEDICAL CARE IN SAN ANTONIO – TAYLOR HUBER

122.    Taylor Huber was discharged from Children's Hospital Colorado and returned to her home in San Antonio by air transport.

123.    Taylor Huber was seen for follow-up care at Southwest Children's Center in San Antonio on January 5, 2017.

124.    Taylor Huber was taken to SW Children's Center for follow-up care on January 14, 2017 – the date of her mother's funeral.  She was crying and complaining of chest pain and underwent extensive testing related to her internal injuries.

125.    Two days later, on January 16, 2017, Taylor Huber had surgery at Children's Hospital in San Antonio to reset her leg fractures in another closed reduction surgery.

126.    On January 31, 2017, Taylor Huber had her long leg cast removed and replaced with a short leg cast.

127.    On February 21, 2017, Taylor Huber was using a cam walker/boot and was complaining of upper back pain.

128.    Taylor Huber was in a full leg cast for two months, half cast for six weeks and continues with weekly physical therapy for the various physical rehabilitations.

## EMERGENCY MEDICAL CARE – ASHLEY HUBER

129.    Ashley Huber was transported by ambulance to Middle Park Medical Center after her sister.  Ashley arrived at the Emergency Department at 10:40 a.m.

130.    Ashley Huber's pain on admission was "severe" and 10 on a scale of 10.  She was complaining of pain in her head, back, left leg and abdomen.

131.    Ashley's Huber's initial assessment indicated she had possible loss of consciousness due to her fall.  Ashley told law enforcement officials that she didn't really remember everything that happened after the fall because she kept falling asleep, which is an indication of a closed head injury.

132.    Ashley Huber's initial assessment also noted: her chest was tight and hurt when she breathed; her abdomen was tight and made her hips hurt; she had pain in her pelvis; and she had lacerations and multiple abrasions on her face from her fall.

133.    At 11:15 a.m., Ashley Huber was taken to Radiology for a CT scan of her head. She returned to the Emergency Department at 11:35 a.m.

134.    After Taylor Huber was airlifted to Children's Hospital in Aurora, the following note appeared in Ashley's chart:  "Sister transferred to Denver via helicopter and mother deceased on unit.  So transferring mother to coroner's office and then transporting patient."

135.    At 1:00 p.m., Ashley Huber had ice applied to the wound over her left eye due to swelling.

136.    Ashley Huber was diagnosed with a comminuted fracture of her left tibia with extension to her growth plate.  She was also diagnosed with a fractured left tibia, and suffered a severe facial injury as a result of her fall.

**MEDICAL CARE IN SAN ANTONIO – ASHLEY HUBER**

137.     Ashley Huber was flown home to San Antonio, where she received follow-up care for her injuries, including a full leg cast on her left leg.

138.     On January 18, 2016, Ashley Huber's long leg cast was removed and she was given a short leg cast with partial weight bearing.  During that visit, she was also noted to have a wedge compression fracture of a thoracic vertebrae from her fall from Chair No. 58.

139.     On February 7, 2017, Ashley Huber's short leg cast was removed and she was placed in a boot/cam walker.  The note for this visit stated that Ashley Huber is "at significant risk of physeal arrest" due to her leg fractures (the bony bridge crossing the growth plate that can result in growth disturbance and/or deformity).

140.     On February 21, 2017, Ashley Huber discontinued use of her boot/cam walker and began using an ankle brace.

**POST-TRAUMATIC STRESS AND EMOTIONAL TRAUMA**



141.    Both Taylor and Ashley Huber suffered post-traumatic stress and emotional trauma from experiencing the fall and their mother's tragic injuries and eventual death.  Both Taylor and Ashley Huber have undergone and continue to go to counseling due to their emotional distress and pain.

142.    On information and belief, both Taylor Huber and Ashley Huber suffered permanent physical impairment and disfigurement as a result of the injuries and mental trauma they experienced due to their falls from Chair No. 58 on the Quick Draw Express.

**INVESTIGATION – COLORADO PUBLIC TRAMWAY SAFETY BOARD**

143.    On April 13, 2017, Joe Gmuender sent an email to Lawrence Smith of the Colorado Public Tramway Safety Board ("PTSB").  In his email, Gmuender identified the "service brake control system" as a possible cause of the failure of the Quick Draw Express on December 29, 2016.  Gmuender identified the service brake modulation function as possibly not operating properly, which "could possibly introduce a pulse of energy into the haul rope that could be magnified by the dynamic response of the ropeway and drive system."  Gmuender also noted two discrepancies in the brake regulator fault function and the timer relay function.

144.    The Colorado Public Tramway Safety Board ("PTSB") conducted an investigation into the circumstances that caused the Quick Draw Express malfunction and resulting death of Kelly Huber and severe injuries to Ashley Huber and Taylor Huber.  The PTSB issued a Final Investigation Report on May 10, 2017.  In its Report, the PTSB concluded that "there was no outside influence of energy, i.e., wind, tree contact or other force inducing additional energies into the cable system, and indicated there was no passenger misconduct."

145.    The PTSB Final Investigation Report also noted that a witness had noted a "noticeable increase in dynamic cable movement [on the Quick Draw Express] during the first ten

days of this season" at Ski Granby Ranch; and "the line was much more dynamic than in the previous ten years…"  These dynamic movements "occurred along the entire line" and "were reported to area representatives."

146.    The PTSB site investigation at Ski Granby Ranch confirmed that Chair No. 58 made contact with Tower 5.  When the PTSB Investigative Team attempted to replicate the events that caused Kelly Huber's death, they noted that "carrier swing between Towers 3 and 4 became so violent that the test was stopped before the lift was damaged.  After load repositioning, the test was repeated with rapid speed changes and yielded similar results.  Tests were suspended for the day."  Subsequent testing also resulted in significant carrier swing at the lower terminal.

147.    The PTSB Investigative Team concluded that Chair No. 58 collided with Tower 5 at an angle approximately 40 degrees from horizontal.  The Investigative Team concluded "there was no passenger misconduct on the lift, Carrier 58 did not collide with an external fixtures to cause it to swing into Tower 5 and the weather conditions were not a factor."

148.    The PTSB Investigative Team concluded that the electric drive modifications and rapid changes in the lift speed were both contributing factors to the tragic event that killed Kelly Huber and injured Ashley Huber and Taylor Huber.

149.    The PTSB itself concluded that the performance of the new electric drive was the primary cause of this tragedy.  Significantly, the PTSB Investigative Team "remains steadfast in its opinion that the existing configuration of the electronic drive and the original, pre-modified low-voltage system were unsafe for public operation."

150.    The Defendant's negligence created an unreasonable risk of physical harm and caused both Ashley Huber and Taylor Huber to be put in fear of their own safety.

151.    The fear experienced by Ashley and Taylor Huber during the events leading up to, during and following their ejection from Chair No. 58 on the Quick Draw Express lift at Ski Granby Ranch had physical consequences and resulted in long-continued emotional disturbances.

**CONDUCT OF KELLY HUBER, ASHLEY HUBER AND TAYLOR HUBER**

152.    Kelly Huber did nothing that caused or contributed to her fall from Chair No. 58 on December 29, 2016, while riding the Quick Draw Express at Ski Granby Ranch.

153.    Kelly Huber did nothing that caused or contributed to Ashley Huber's fall from Chair No. 58 on December 29, 2016 while riding the Quick Draw Express at Ski Granby Ranch.

154.    Kelly Huber did nothing that caused or contributed to Taylor Huber's fall from Chair No. 58 on December 29, 2016 while riding the Quick Draw Express at Ski Granby Ranch.

155.    Ashley Huber did nothing that caused or contributed to her fall from Chair No, 58 on December 29, 2016 while riding the Quick Draw Express at Ski Granby Ranch.

156.    Ashley Huber did nothing that caused or contributed to Kelly Huber's fall from Chair No, 58 on December 29, 2016 while riding the Quick Draw Express at Ski Granby Ranch.

157.    Ashley Huber did nothing that caused or contributed to Taylor Huber's fall from Chair No, 58 on December 29, 2016 while riding the Quick Draw Express at Ski Granby Ranch.

158.    Taylor Huber did nothing that caused or contributed to her fall from Chair No, 58 on December 29, 2016 while riding the Quick Draw Express at Ski Granby Ranch.

159.    Taylor Huber did nothing that caused or contributed to Kelly Huber's fall from Chair No, 58 on December 29, 2016 while riding the Quick Draw Express at Ski Granby Ranch.

160.    Taylor Huber did nothing that caused or contributed to Ashley Huber's fall from Chair No, 58 on December 29, 2016 while riding the Quick Draw Express at Ski Granby Ranch.

**FIRST CLAIM FOR RELIEF**
**Highest Duty of Care Ski Lift Operator**
**Wrongful Death of Kelly Huber**

161.    Plaintiff incorporates by reference paragraphs 1 – 160 of this Complaint.

162.    Kelly Huber was born on November 23, 1976 and had a life expectancy of approximately 42 years at the time of her death.

163.    Kelly Huber was employed full-time with Aetna Life Insurance Company as Senior Director, National Product Programs, at the time of her death.  She had worked for Aetna since she was in high school.  She was very successful in her business career and enjoyed her work.




164.    The Defendant owed Kelly Huber, Ashley Huber and Taylor Huber the highest duty of care as a Colorado Ski Lift Operator while operating the Quick Draw Express ski lift at Ski Granby Ranch on December 29, 2016.

165.    The Defendant, through its employees, supervisors, managers, owners and operators, failed to exercise the highest duty of care by:

    a.    Failing to properly design the modifications to the Quick Draw Express before opening it to the public on December 16, 2016;

b.  Failing to properly construct the modifications to the Quick Draw Express before opening it to the public on December 16, 2016;

c.  Failing to properly maintain the Quick Draw Express before and after December 16, 2016, including failure to identify the cause of problems reported to the Defendant prior to December 29, 2016;

d.  Failing to properly operate the Quick Draw Express on December 29, 2016;

e.  Failing to immediately shut down, properly inspect and repair known problems with the Quick Draw Express prior to December 29, 2016.

166.  As a direct proximate result of the Defendant's failure to exercise the highest duty of care, Kelly Huber suffered injuries and damages resulting in her death.

167.  The negligent acts and/or omissions resulting in Kelly Huber's death have caused past and future damages to Ashley Huber and Taylor Huber, pursuant to Colo.Rev.Stat. § 13-21-202 and § 13-21-203.

168.  Those damages include noneconomic damages for any grief, loss of companionship, impairment of quality of life, inconvenience, pain and suffering, and emotional stress that Ashley Huber and Taylor Huber had to the time of trial; and any grief, loss of companionship, impairment of the quality of life, inconvenience, pain and suffering, and emotional stress Ashley Huber and Taylor Huber will have from the date of trial into the future.

169.  Those damages also include any economic losses, including reasonable funeral, burial, internment, or cremation expenses, and any net financial loss which Ashley Huber and Taylor Huber have had because of the death of Kelly Huber.  This net financial loss is the same as the financial benefit that Ashley Huber and Taylor Huber might reasonably have expected to receive from Kelly Huber had she lived out her normal life expectancy.

**SECOND CLAIM FOR RELIEF**
**Highest Duty of Care Ski Lift Operator**
**Bodily Injuries of Ashley Huber**

170.    Plaintiff incorporates by reference paragraphs 1 – 169 of this Complaint.

171.    As a direct proximate result of the Defendant's failure to exercise the highest duty of care, Ashley Huber suffered injuries, losses, and damages in her own right.   Her damages include past and future medical and hospital and life care expenses; past and future physical and mental pain and suffering, including loss of enjoyment of life; past and future physical disfigurement and disability; loss of future earnings and earning capacity.

**THIRD CLAIM FOR RELIEF**
**Highest Duty of Care Ski Lift Operator**
**Bodily Injuries of Taylor Huber**

172.    Plaintiff incorporates by reference paragraphs 1 – 171 of this Complaint.

173.    As a direct proximate result of the Defendant's failure to exercise the highest duty of care, Ashley Huber suffered injuries, losses, and damages in her own right.   Her damages include past and future medical and hospital and life care expenses; past and future physical and mental pain and suffering, including loss of enjoyment of life; past and future physical impairment and disfigurement; and loss of future earnings and earning capacity.

**FOURTH CLAIM FOR RELIEF**
**Negligence *Per Se* - Kelly Huber**

174.    Plaintiff incorporates by reference paragraphs 1 – 173 of his Complaint.

175.    At all times material to this case, the Defendant was in violation of one or more provisions of Colorado law, including, but not limited to, Colo.Rev.Stat. § 25-5-716.

176.    Colo.Rev.Stat. § 25-5-716 states that if an unreasonable hazard exists in the continued operation of a passenger tramway, the area operator shall immediately follow procedures for an emergency shutdown.

177.     Colo.Rev.Stat. § 25-5-716 was in effect from the moment the modified Quick Draw Express lift was first licensed and applied to the operation of the Quick Draw Express ski lift by Ski Granby Ranch at the time of Kelly Huber's injuries and death and the time Ashley Huber and Taylor Huber were severely injured on December 29, 2016.

178.     Ski Granby Ranch violated Colo.Rev.Stat. § 25-5-716 by failing to immediately follow procedures for an emergency shutdown when it knew or should have known that the modified Quick Draw Express lift presented an unreasonable hazard in its continued operation.

179.     The purpose of this and other similar provisions is to prevent against the types of injuries, damages, and losses suffered by Kelly Huber, Ashley Huber and Taylor Huber.

180.     The Defendant's violation of this provision of Colorado law constitutes negligence *per se*.

181.     Defendant's violation of the statute set forth above was a direct and proximate cause of Kelly Huber's injuries and death.

182.     Plaintiff is entitled to damages for the wrongful death of Kelly Huber, as set forth in his Prayer for Relief.

## FIFTH CLAIM FOR RELIEF
### Negligence *Per Se* - Ashley Huber

183.     Plaintiff incorporates by reference paragraphs 1 – 182 of his Complaint.

184.     Defendant's violation of the statute set forth above was a direct and proximate cause of Ashley Huber's injuries and damages.

185.     Ashley Huber is entitled to past and future economic and noneconomic damages, as set forth in her Prayer for Relief.

**FIFTH CLAIM FOR RELIEF**
**Negligence *Per Se* - Taylor Huber**

186.    Plaintiff incorporates by reference paragraphs 1 – 185 of his Complaint.

187.    Defendant's violation of the statute set forth above was a direct and proximate cause of Taylor Huber's injuries and damages.

188.    Taylor Huber is entitled to past and future economic and noneconomic damages, as set forth in her Prayer for Relief.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff William Huber, as parent and guardian of Ashley Huber and Taylor Huber, Individually, and as Surviving Children of Kelly Huber, deceased, respectfully requests that the Court enter judgment in his daughters' favor and against the Defendant, Granby Realty Holdings, LLC, d/b/a Ski Granby Ranch, and award him the following relief:

a.    For past and future compensatory economic and non-economic damages in amounts which will fully compensate for all the injuries and damages suffered by Ashley Huber and Taylor Huber, including general and special damages without limitation, pain, suffering, loss of enjoyment of life, physical impairment, lost wages, loss of earning capacity, medical and hospital expenses and life care expenses to be proved at trial;

b.    For the wrongful death of their mother, Kelly Huber, including:

- noneconomic damages for any grief, loss of companionship, impairment of quality of life, inconvenience, pain and suffering, and emotional stress that Ashley and Taylor Huber had to the time of trial; and any grief, loss of companionship, impairment of the quality of life, inconvenience, pain and suffering, and emotional stress Ashley and Taylor Huber will have from the date of trial into the future.

- any economic losses, including reasonable funeral, burial, internment, or cremation expenses, and any net financial loss which Ashley and Taylor Huber have had because of the death of Kelly Huber.  This net financial loss is the same

34

as the financial benefit that Ashley and Taylor Huber might reasonably have expected to receive from Kelly Huber had she lived out her normal life expectancy.

c.      Prejudgment interest beginning from date of Incident and post judgment interest.

d.      For reasonable attorneys' fees and costs of suit herein; and

e.      For such other and further relief as this Court deems just and proper.

**PLAINTIFF DEMANDS A TRIAL BY JURY**

Respectfully submitted this 15th day of December, 2017.

LEVENTHAL & PUGA, P.C.

By:     */s/  Bruce L. Braley*
        James M. Leventhal, #5815
        Bruce L. Braley, #48612
        Brian N. Aleinikoff, #49238
        *Attorneys for Plaintiff*

Plaintiff's Address
William Huber
1319 Hawks Meadow
San Antonio, TX  78248

*In accordance with C.R.C.P. 121 § 1-26(9), a printed copy of this document with original signatures is maintained by the filing party and will be made available for inspection by other parties or the Court upon request.*