**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**
**Judge Raymond P. Moore**

Civil Action No. 1:17-cv-03024-RM-MEH

WILLIAM HUBER, as parent and guardian of
ASHLEY HUBER and
TAYLOR HUBER, individually and as surviving children of
KELLY HUBER, deceased,

    *Plaintiffs*,

GRANBY REALTY HOLDINGS, LLC d/b/a SKI GRANBY RANCH,
GRANBY RANCH AMENITIES, LLC d/b/a SKI GRANBY RANCH,
EDWARD J. THOMPSON, d/b/a/ ELECTRAMIC ASSOCIATES,
JOSEPH GMUENDER, P.E. and GMUENDER ENGINEERING, LLC,

    *Defendants*.

___

## ORDER
___

Kelly Huber and her two young daughters, Taylor and Ashley, fell approximately twenty-five feet from a rocking ski chairlift. Kelly died, and the girls sustained injuries. Through the girls' father, the Hubers brought this diversity action against the owner and operator of the ski area Granby Realty Holdings, LLC and Granby Ranch Amenities, LLC (collectively, and referred to singularly as, Granby) and subsequently joined Thompson, who upgraded the chairlift at issue, and Gmuender and Guemender Engineering, LLC (collectively, Guemender), who provided engineering services in relation to that upgrade. All claims sound in state law.

There are several motions before the Court. Granby moved to dismiss on the grounds that this Court is an improper forum. All Defendants have further argued, in one way or another, that certain claims are not legally cognizable or inapplicable. Finally, the Hubers have moved to certify questions of state law to the Colorado Supreme Court.

I.  BACKGROUND

   A. Factual Allegations[1]

Defendant Granby owns and operates Granby Ranch, a Colorado resort open to the public for skiing and snowboarding. (Fourth Am. Compl. ¶¶ 40–41, ECF No. 65.) Granby also owns and operates the Quick Draw Express ski lift. (*Id.* ¶¶ 44, 48.) Sometime in 2016, Granby contacted Defendant Edward Thompson to discuss replacing the control system and electric drive on the lift. (*Id.* ¶ 65.) Thompson then contacted Defendant Josef Gmuender to provide engineering services for the project. (*Id.* ¶ 66.) Between November 28 and December 4, 2016, Thompson and Gmuender worked on the Quick Draw Express replacing and tuning the electric drive, interfacing the wiring, and performing routine maintenance and testing. (*Id.* ¶¶ 69–72.) The lift opened on December 15, 2016. (*Id.* ¶¶ 75–76.) Over the following weeks, riders experienced and reported unsafe conditions on the lift to Granby management, including "intense, high amplitude swinging and bounce [that] was way out of the ordinary" and significant enough to make it necessary to "hold onto something" to stay in the chairs. (*Id.* ¶¶ 77–78.)

Back on October 18, 2016, Kelly Huber[2] bought a "Family of 4 Season Pass 2016/2017" to ski Granby Ranch on the website of third-party vendor GetSkiTickets.com. (*See* ECF No. 83-1.) She paid the full price for the season passes online by credit card at that time. (*See* ECF No. 83-2.) The website stated that "[a]ll purchases through this website are non-refundable and non-transferrable. . . . To redeem your purchase, please print and redeem this itinerary confirmation

---

[1]  While courts must generally take the allegations of a party as true—and abstain from considering extraneous materials—when considering its opponents' motion to dismiss for failure to state a claim, Granby has additionally moved to dismiss on the grounds of *forum non conveniens*, and the Court therefore considers the materials the parties have attached to their briefing on this issue.

[2]  The Hubers are all citizens and residents of Texas. (Fourth Am. Compl. ¶¶ 2–3.) Granby is incorporated, and has its principle place of business, in Colorado. Its members are also organized in Colorado. (*Id.* ¶¶ 13–19.) Thompson is California resident. (*Id.* ¶ 30.) Gmuender is a Nevada business and resident. (*Id.* ¶¶ 31–34.)

2

voucher with a picture ID to Granby Ranch ticket window." (*See* ECF No. 83-4.) On December 27, 2016, Kelly arrived at Ski Granby Ranch and presented her vouchers to obtain the season passes. She signed a "Granby Ranch Season Pass Agreement" (Agreement), which set forth language concerning assumption of risk, duties of pass holders in using the pass, a release and indemnification clause, and provisions permitting Granby to call for medical care on behalf of a holder. It also contained the following specific language:

> The Undersigned understands that [using the ski area permit area, facilities, and lifts for any purpose] can be HAZARDOUS AND INVOLVES THE RISK OF PHYSICAL INJURY AND/OR DEATH. . . . The risks and dangers of the activity include, but are not limited to: falling; . . . lift loading, unloading, and riding[.] . . . [T]his Agreement shall be governed by the laws of the State of **Colorado**, and the exclusive jurisdiction and venue for any claim shall be located in the state courts located in **Grand** County, **Colorado**. . . . I HAVE CAREFULLY READ THIS AGREEMENT AND UNDERSTAND ITS CONTENTS. I AM AWARE THAT I AM RELEASING LEGAL RIGHTS THAT OTHERWISE MAY EXIST.

(ECF No. 83-5 ¶¶ 2, 7 (emphasis in original).) According to Granby, it does not actually sell season passes on GetSkiTickets.com, but a third party does on its behalf. Granby further maintains that during the 2016–2017 season, all guests that pre-purchased season passes online would be made to sign the Agreement upon pickup, at which point the passes would be printed and provided to the guest. (ECF No. 86-1 ¶¶ 2–3.)

At 9:07 a.m. on December 29, 2016, a Granby employee noticed that the Quick Draw Express "stopped unusually fast," but her computer monitor showed no information about the stop. Mechanics discovered a fault with the electric drive and restarted the lift. (Fourth Am. Compl. ¶ 86.) Thereafter, the Hubers boarded it, with Kelly sitting in the middle and her daughters on either side. (*Id.* ¶¶ 87–88.)

The Court does not need to labor over the events that followed. At approximately 9:42 a.m., several chairs on the lift began swinging violently; the Hubers were ejected from their seats and fell twenty-five feet to the nearly flat, hard-packed snow below. (*Id.* ¶¶ 6, 89–102.) There were a number of witnesses, including guests and Granby employees. (*Id.* ¶¶ 89–101.) Kelly was pronounced dead at 10:46 a.m. (*Id.* ¶ 116.) Taylor and Ashley both had broken bones and have suffered emotional distress. (*Id.* ¶¶ 117–51.)

The Colorado Public Tramway Safety Board (PTSB) conducted an investigation into the Quick Draw Express malfunction. (*Id.* ¶ 153.) In subsequent testing, the PTSB was able to replicate the violent swinging reported on the day of the incident and concluded that the Hubers' chair had collided with an adjacent tower, there was no passenger misconduct, weather conditions were not a factor, and the performance of the new electric drive was the cause of the tragedy. (*Id.* ¶ 155–58.)

**B. Procedural Posture**

The Hubers initiated this case against Granby Realty Holdings, LLC in this Court on December 15, 2017, filing a Complaint and First Amended Complaint the same day. (*Compare* ECF No. 1 *with* ECF No. 2.)[3] The pleadings alleged six claims for relief styled as "highest duty of care" and "negligence *per se*" on behalf of each of the three Hubers. (*See* ECF No. 2.) On January 19, 2018, Granby accepted service. (ECF No. 14.)[4] In response to the Court's *sua sponte* order regarding subject-matter jurisdiction, and following conferral with opposing counsel, the

---

[3] As the Court sees, the differences between these two pleadings were to correct minor typographical mistakes. Other than adding the case number and the word "amended" to the second pleading, the Amended Complaint's only corrections were changing the date of Taylor Huber's surgery on her broken leg to December 31, 2016 from December 21, 2016 in Paragraph 120; adding the words "an additional" to Paragraph 162; and changing "Ashley" to "Taylor" in Paragraph 173. The claims for relief remained essentially unchanged.

[4] Both Granby parties accepted service, even though the Second Amended Complaint, which added Granby Ranch Amenities, had not yet been filed. (*See* ECF Nos. 14, 18.)

Hubers sought leave to file a Second Amended Complaint and did so on January 23, 2018, adding Granby Ranch Amenities, LLC as a Defendant. (ECF Nos. 11, 13, 16, 17, 23-1.)[5]

On February 1, 2018, the parties participated in a Rule 26(f) conference, during which they agreed to a pleading amendment deadline of July 1, 2018 and discovery deadline of January 15, 2019. (ECF No. 22.) Those deadlines have since been pushed back, and discovery is currently due September 13, 2019. (ECF No. 120.) The proposed scheduling order included a statement of jurisdiction indicating complete diversity, an amount in controversy exceeding $75,000.00, and that the tortious conduct that gave rise to these claims occurred in Colorado. (*Id.* at 1.) Granby also pointed to the work performed by Thompson and Gmuender in its statement of defenses. (*Id.* at 2.) The Court adopted the proposed scheduling order. (ECF No. 28.) Meanwhile, Granby sought an extension of time to answer the Second Amended Complaint through March 20, 2018—based on its earlier waiver of service and the parties' January 19, 2018 agreement—which the Court granted. (*See* ECF Nos. 23, 23-1, 26.)

On March 20, 2018, Granby moved to dismiss solely pursuant to Fed. R. Civ. P. 12(b)(6), arguing that the Colorado Premise Liability Act (CPLA) preempted the common law claim for breach of the "highest degree of care" and Colo. Rev. Stat. Ann. § 25-5-716 does not provide a statutory standard of care which is adequate to support the claims for negligence *per se*. (*See* ECF No. 34, at 2.)[6] On April 10, the Hubers responded to the motion and simultaneously sought to again amend the complaint to add a count under the CPLA and clarify their original claims. (ECF Nos. 36, 38.) On April 24, the Court granted the motion to amend and denied the pending dismissal motion as moot. (ECF No. 46.) The next day, the Hubers filed the Third Amended

---

[5] Other than adding the new Defendant, modifying sentences to refer to Defendants in plural, and including several pictures of the family and the Quick Draw Express, the Second Amended Complaint added nothing substantive.

[6] The Court denied Granby's first motion to dismiss, filed five days earlier, because it had failed to abide by the Court's practice standards requiring conferral. (ECF Nos. 29, 33.)

Complaint, which was the first to specify that "[o]n the morning of December 29, 2016, Kelly Huber purchased lift tickets" and provide pictures indicating that they were season passes. (ECF No. 47 ¶¶ 72–73.)

On May 9, 2018, Granby again moved to dismiss—this time asserting both that this Court was an improper forum and, in the alternative, that the "highest duty of care" claims remained non-cognizable. (ECF No. 48.)[7] In support of the improper-forum argument, Granby stated that "[u]sing the images of the season passes in the third amended complaint, the defense determined that decedent Kelly Huber executed a season pass agreement for herself and two children on or about December 27, 2016" and pointed to the language quoted above. (*Id.* at 2.) The Hubers responded by supporting the propriety of their "highest duty" claims and filing a motion to certify questions of state law to the Colorado Supreme Court on the subject. (ECF Nos. 51, 52.) They also resisted Granby's forum argument. (ECF No. 51, at 2.)

While these motions were pending, the Hubers filed another motion to amend the complaint to join Defendants Thompson and Gmuender, which the Court granted. (ECF Nos. 62, 64.) In light of the filing of the Fourth Amended Complaint (ECF No. 65),[8] the Court denied the motions to dismiss (ECF No. 48) and to certify (ECF No. 52) as moot. Since then, Defendants (now including Thompson and Gmuender) have refreshed their briefings on new motions to dismiss—on both improper forum and state law grounds—and the Hubers have renewed their motion to certify questions of state law to the Colorado Supreme Court. (ECF Nos. 71, 83, 84, 86, 87, 88, 89, 90, 94, 95, 101, 102.) These are before the Court.

---

[7]  This first motion to dismiss on the grounds of improper forum was incorrectly styled as a Rule 12(b)(3) motion. Granby corrected this error in its subsequent motion to dismiss.

[8]  Curiously, even though one of the Hubers' responses to Granby's forum-selection argument rests on the fact that Kelly had purchased the lift passes back in October—at which time she was not required to sign the clause in question—the Fourth Amended Complaint, filed after the first motion to dismiss on the subject, still contains the allegation that Kelly purchased the lift tickets on the morning of December 29, 2016. (ECF No. 65 ¶ 81.)

## II. ANALYSIS

The Court's first priority is resolving whether this forum is proper. Rather than by motion to transfer venue, "[t]he appropriate way to enforce a forum-selection clause pointing to a state or foreign forum is through the doctrine of *forum non conveniens*." *Atl. Marine Const. Co. v. U.S. Dist. Court for W. Dist. of Texas*, 571 U.S. 49, 60 (2013). Under this doctrine, "the court may, in the exercise of its sound discretion, dismiss the case, even if jurisdiction and proper venue are established." *Yavuz v. 61 MM, Ltd.*, 576 F.3d 1166, 1172 (10th Cir. 2009) (quoting *Am. Dredging Co. v. Miller*, 510 U.S. 443, 447–48 (1994). The Tenth Circuit explained:

> The Supreme Court directs us to several considerations in analyzing whether an action should be dismissed for *forum non conveniens* pursuant to a forum-selection clause. At the outset, a court must determine whether the forum-selection clause controls. If the clause controls and points to a state or foreign forum, then the court may apply the doctrine of *forum non conveniens*. When determining whether to dismiss for *forum non conveniens*, the court grants no weight to the plaintiff's choice of forum or the parties' private interests, since these are deemed to have been fully expressed in the contract and weigh in favor of dismissal. A "valid forum-selection clause should be given controlling weight in all but the most exceptional cases."

*Kelvion, Inc. v. PetroChina Canada Ltd.*, 918 F.3d 1088, 1091 (10th Cir. 2019) (internal citations omitted; quoting and citing *Atl. Marine Const. Co.*, 571 U.S. at 60–64). Thus, if it determines that the clause controls, a court may only consider whether public interest factors weigh in favor of dismissal. *See Yavuz*, 576 F.3d at 1180; *Kelvion, Inc.*, 918 F.3d at 1094.

### A. Applicability of the Agreement

Here, the Agreement filed by Granby in support of its motion to dismiss appears to be valid and enforceable against the Hubers on its face. But the Hubers argue it does not control here for three reasons: (i) clarifying that Kelly had purchased the passes online two months before signing the Agreement, they argue that substantial time had passed before Granby had her

sign it, which was an improper attempt to modify an original purchase agreement without additional consideration; (ii) because Kelly did not have the option to reject the forum selection clause without forfeiting the full price of her family's season passes, the forum selection clause was fundamentally unfair and unreasonable; and (iii) Granby has waived recourse to the forum selection clause by extensively litigating in this Court. (*See generally* ECF No. 83.)

> **i. Lack of temporal proximity does not automatically create a modification.**

Regarding the Hubers' first argument, the Court does not view the Agreement as a modification. The Hubers submit that "where there is sufficient time lapse between the initial agreement and a subsequent modification, Colorado courts characterize the later change as a contract modification requiring separate consideration." (ECF No. 83, at 6.) They claim support for this contention in *Mincin v. Vail Holdings, Inc.*, 308 F.3d 1105 (10th Cir. 2002). In that case, at the bottom of the mountain, the plaintiff purchased a gondola ticket and bike rental coupon, which he was instructed to redeem at the bike rental area at the top of the mountain. *Id.* at 1107. But when he got to the top, he was presented with a rental agreement that contained additional exculpatory language and which he signed. *Id.* The Tenth Circuit began by reviewing Colorado law, which dictates that a contract modification generally requires additional consideration. *Id.* at 1109 (citing *H & W Paving Co. v. Asphalt Paving Co.*, 364 P.2d 185, 186 (Colo. 1961)). In *H & W Paving Co.*, a purchaser of asphalt had a written agreement with a supplier which required the supplier to notify the purchaser in writing if it was to increase the price of asphalt for the forthcoming year. *H & W Paving Co.*, 364 P.2d at 185–86. When the supplier later sued to enforce payment, it contended that the purchaser had subsequently consented to an increase in price by oral agreement not reflected in writing like it should have been. *Id.* at 186. The Supreme Court of Colorado was not impressed with the supplier's contention, reminded the parties of

"[t]he general rule is that a naked promise to release a party to a contract from performance of that which he is already under obligation to perform by its terms[] is not a valid consideration," and refused to enforce the modification. *Id.* Even though the *H & W Paving Co.* decision was not based on the time lapse between the original agreement and its subsequently alleged oral modification—and it certainly did not hold the oral accord to be a modification *because of* that time lapse—the Tenth Circuit in *Mincin* summarized that the "Colorado Supreme Court [has] held that a change to a contract made several months after the original contract was signed required additional consideration." *Mincin*, 308 F.3d at 1109 (citing *H & W Paving Co.*, 364 P.2d at 186). In affirming the district court's finding that that the exculpatory agreement signed by the biker was not a modification requiring additional consideration, the Circuit found that the buying of the coupon at the bottom of the mountain and signing of the release at the top were "better considered part of the same transaction." *Id.* at 1109.

More recently, this Court faced a similar lack-of-consideration argument in the ski pass context. *See Patterson v. Powdermonarch, L.L.C.*, No. 16-CV-00411-WYD-NYW, 2017 WL 4158487 (D. Colo. July 5, 2017). There, the plaintiff bought tickets online and picked them up two days later. No language purporting to release the mountain management from liability for any of its conduct ever appeared during the online transaction or in the confirmation e-mail. However, such language did appear on the physical tickets. Ultimately, this Court rejected the plaintiff's time lapse lack-of-consideration theory, explaining that *Mincin*'s reference to a sufficient hiatus referred to cases where there was a change to a contract made several months after the original contract was signed. *Patterson*, 2017 WL 4158487, at *6. But importantly, even though the decision in *Patterson* again focused on (and rejected) the temporal argument, this Court found that the exculpatory clause was an integrated part of the whole

9

transaction and "[t]here is an even stronger reason in this case for this holding because the lift ticket itself, which contained the exculpatory language, was integral to Plaintiff's ability to ride the chair lift . . . , which Plaintiff knew when she purchased the ticket." *Id.* Finally, both *Mincin* and *Patterson* cited with approval a case from the Court of Appeals of Minnesota, which reminded the parties before it of its previous holding "that an exculpatory agreement signed after a fee to participate in a recreational activity has been paid is part of the same transaction and is therefore enforceable without additional consideration other than permission to participate in the activity." *Beehner v. Cragun Corp.*, 636 N.W.2d 821, 829 (Minn. Ct. App. 2001).

With respect to the federal decisions cited by the Hubers that allude to temporality, the Court is obligated to apply principles of Colorado contract law as they have been laid forth by binding Colorado authority. Quite simply, the cited federal cases were not decided on the basis of delay (though they paid lip service to the concept), and neither were the Colorado cases cited within them. Rather, as all the authority cited by both parties supports, the structure of the transaction is more important than the time it takes to accomplish. With regard to the Hubers specifically, and like the plaintiff in *Patterson*, they were aware, even after paying online, that additional steps stood between them and receipt of their season passes. Within the posture of such transactions, the Court is not convinced that any additional consideration would be required for Granby to obtain release documents from season pass holders in exchange for its permission to make use of its land for extended recreational activities and to provide purchased lift tickets. Additionally, neither the allegations nor the filed supporting documents suggest that a would-be season pass holder at Granby may avoid the complete agreement to which all others are subject either by purchasing a ticket online, as opposed to at the mountain, or by doing so when prices are presumably lower many months before a season begins.

### ii. The Agreement was not fundamentally unreasonable.

The Hubers' second argument is that "[f]orum selection clauses are unfair or unreasonable when the party to be bound does not have the option to reject the clause without incurring a penalty." (ECF No. 83, at 7.) Kelly, they argue, had no choice but to sign the Agreement once the family reached the mountain because the host of collateral expenses she had incurred—including travel and lodging—to make use of the nonrefundable passes would leave it cost prohibitive for her to reject this final document with impunity. (*Id.* at 9.) In support of this conclusion, they cite a single sentence from the Supreme Court, in which it observed that the respondents before it, passengers on a cruise line, "were given notice of the forum provision and, therefore, presumably retained the option of rejecting the contract with impunity." *Carnival Cruise Lines, Inc. v. Shute*, 499 U.S. 585, 595 (1991). Using this consideration as their polestar, and suggesting that "there is no Colorado case directly on point," the Hubers cite a few additional non-binding authorities which latched onto this single facet of *Shute*. *See, e.g.*, *Corna v. Am. Hawaii Cruises, Inc.*, 794 F. Supp. 1005, 1011 (D. Haw. 1992).

But there are Colorado cases on point. In Colorado, "a forum selection clause is presumptively valid unless it is unreasonable, fraudulently induced, or against public policy." *Cagle v. Mathers Family Tr.*, 295 P.3d 460, 465 (Colo. 2013) (expressly choosing to follow *M/S Bremen v. Zapata Off-Shore Co.*, 407 U.S. 1 (1972), the predecessor to *Shute*). This burden is heavy:

> It should be incumbent on the party seeking to escape his contract to show that trial in the contractual forum will be so gravely difficult and inconvenient that he will for all practical purposes be deprived of his day in court. Absent that, there is no basis for concluding that it would be unfair, unjust or unreasonable to hold that party to his bargain.

*Adams Reload Co. v. Int'l Profit Assocs., Inc.*, 143 P.3d 1056, 1060 (Colo. App. 2005) (also citing *M/S Bremen*). The holding in *M/S Bremen*, upon which these cases rely, states that a forum-selection clause is "prima facie valid and was to be honored by the parties and enforced by the courts in the absence of some compelling and countervailing reason making enforcement unreasonable." *M/S Bremen*, 407 U.S. at 1. And even *Shute* itself did not limit its analysis to the rejection-with-impunity status of a ticket buyer. There, discussing the reasonableness of a forum-selection clause requiring litigation in Florida for cruise passengers—and in the context of admiralty law—the Supreme Court acknowledged that "[c]ommon sense dictates that a ticket of this kind will be a form contract the terms of which are not subject to negotiation, and that an individual purchasing the ticket will not have bargaining parity with the cruise line." *Id.* at 593. Even so, the Court reemphasized its focus on the holding in *M/S Bremen* in the context of more routine transactions and expressly admonished that the "Court of Appeals [below in *Shute*] did not place in proper context this Court's statement in *[M/S] Bremen* that 'the serious inconvenience of the contractual forum to one or both of the parties might carry greater weight in determining the reasonableness of the forum clause.'" *Shute*, 499 U.S. at 594 (quoting *M/S Bremen*, 407 U.S. at 17). Having said this, the Supreme Court found the facts in *Shute* unavailing to the ticket buyer:

> It bears emphasis that forum-selection clauses contained in form passage contracts are subject to judicial scrutiny for fundamental fairness. In this case, there is no indication that petitioner set Florida as the forum in which disputes were to be resolved as a means of discouraging cruise passengers from pursuing legitimate claims. Any suggestion of such a bad-faith motive is belied by two facts: Petitioner has its principal place of business in Florida, and many of its cruises depart from and return to Florida ports. Similarly, there is no evidence that petitioner obtained respondents' accession to the forum clause by fraud or overreaching.

*Shute*, 499 U.S. at 593–95 (1991).

After its review of the controlling and cited authority, the Court agrees with Granby that Colorado law—taken alone—does not provide the escape the Hubers desire. The Court further agrees that the Hubers have overstated *Shute*. The Hubers have not addressed any of the relevant factors pursuant to which a court might ignore a forum selection clause under Colorado law. There is no suggestion that the Agreement itself was presumptively unreasonable, fraudulently induced, or against public policy. The Court also notes that—as season pass holders—the Hubers had the resources, time, and desire to visit Colorado and the Granby Ranch area with some regularity, which sharply undermines any hint that their being citizens of Texas might mean they are seriously inconvenienced by having to litigate in the mountains of this state. Moreover, the other factors discussed in *Shute*, though not strictly controlling, cut against them. Granby has its principle place of business in Grand County, and there is no evidence of bad faith or aim to deter claims present in its selection of that locale. The Hubers have not overcome their burden to show that the Agreement's forum selection clause should be bypassed.

### iii. Granby has not waived its right to assert the forum selection clause.

Finally, the Hubers argue that Granby has waived recourse to the Agreement by "extensively litigating" in this forum. The Court notes that they have not provided a single controlling or favorable case in support of this argument. (*See* ECF No. 83, at 10–14 (citing only Fifth Circuit cases in which no waiver was found or which reverse a district court finding of waiver).) Indeed, the law is unfriendly to them on this point. Unlike Fed. R. Civ. P. 12(h), which provides that a party may waive an improper venue defense under Rule 12(b)(3), "*forum non conveniens* is a discretionary doctrine which is not waived by a party's failure to raise it in an initial responsive pleading. . . . [A] motion to dismiss based on *forum non conveniens* is not a

motion to dismiss for improper venue." *Yavuz*, 576 F.3d at 1173 (internal quotations omitted). Devastatingly to the Hubers, "[i]n modern litigation, there is generally no time limit on when a motion to dismiss for *forum non conveniens* must be made." *Id.* (quoting Wright & Miller, 14D Fed. Prac. & Proc. Juris. § 3828 (3d ed. 2008)).

Despite the gravity of authority against them, the Hubers supply a few reasons they believe show that Granby waived its rights, but none of them are convincing. First, they point to Defendants' extensive motion practice. However, the Tenth Circuit has held that a right to raise forum non conveniens is not waived even post-answer, *id.* at 1174, a stage to which this case has not yet progressed. Moreover, Defendants serial motions to dismiss were but the result of the Hubers' serially morphing pleadings. It was not Defendants who invited extensive, and duplicative, pre-answer paper litigation. Second, they note that discovery, at least in the form of initial disclosures and document production, is underway. But the parties would need to engage in discovery in whichever forum they landed, and they have already "stipulate[d] that any discovery in this action will have the same force and effect if [the Hubers] are required to re-file this case in state court." (ECF No. 86-4.) Third, they blame Granby for causing detriment to its co-Defendants by designating them as non-parties at fault before they were named in the action, thereby "haling them into federal court." (ECF No. 83, at 13.) This suggestion is ludicrous: It was the Hubers—not Granby—that haled Thompson and Gmuender into federal court by amending the action to sue them. Finally, the Hubers argue that this case was widely publicized and resulted in internal and governmental investigations, and Granby should have therefore known of the existence of the Agreement months before it first raised that defense here. While this suggestion raises the Court's eyebrow, Granby did in fact begin relying on the Agreement within a matter of days after the Hubers amended their complaint to include allegations

14

concerning the date of purchase of their tickets and showing that the same were season passes. Under these circumstances, the Court will not run against the heavy legal current disfavoring waiver in the *forum non conveniens* context.

### B. Public Interest Factors

Having determined that the Agreement controls, the Court turns to the public interest factors that inform dismissal on *forum non conveniens* grounds, which the parties have left unaddressed: The administrative difficulties of courts with congested dockets which can be caused by cases not being filed at their place of origin; the burden of jury duty on members of a community with no connection to the litigation; the local interest in having localized controversies decided at home; and the appropriateness of having diversity cases tried in a forum that is familiar with the governing law. *See Yavuz*, 576 F.3d at 1180; *see also Kelvion, Inc.*, 918 F.3d at 1094 ("Having determined the forum-selection clause applies, we . . . may consider arguments about public-interest factors only.")

Here, the Court is unable to supply information concerning the comparative congestions between this Court and the state courts in Grand County, but the other three considerations strongly favor dismissal. The proposed forum is where Granby resides and where the injury occurred. Moreover, the Hubers have raised questions of state law that they have twice implored the Court to certify to the Colorado Supreme Court. Under the circumstances, the more convenient forum is the one more local to the injury, where many of the witnesses reside or work, and where questions of Colorado law are more properly answered.

### III. CONCLUSION

Therefore, the Court **GRANTS** Granby's motion to dismiss (ECF No. 71) on *forum non conveniens* grounds. Having done so, the Court does not decide the merits of the balance of Granby's motion or Thompson's motion to dismiss (ECF No. 89) or Gmuender's motion to dismiss (ECF No. 87), both of which are **DENIED AS MOOT**. The Hubers' motion to certify questions of state law to the Colorado Supreme Court (ECF No. 84) is also **DENIED** as moot. The claims in the Fourth Amended Complaint (ECF No. 65) are **DISMISSED** without prejudice.

DATED this 30th day of May, 2019.

BY THE COURT:

_____
RAYMOND P. MOORE
United States District Judge